Filed 12/29/21  In re J.G. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Colusa)

----

| | |
|---|---|
| In re J.G. et al., Persons Coming Under the Juvenile Court Law. | C094179 |
| COLUSA COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.V.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JU4061 & JU4062 ) |

Appellant M.V., mother of the minors J.G. and A.M., appeals from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  (Welf. &

1

Inst. Code, §§ 366.26, 395.)[1]  Mother contends the juvenile court violated her due process rights by appointing a guardian ad litem without following the statutory procedures for doing so and in the absence of substantial evidence of her lack of capacity to understand the nature and consequences of the proceedings or meaningfully assist her counsel.  Respondent Colusa County Department of Health and Human Services (Department) concedes the juvenile court did not follow the procedures for appointing a guardian ad litem but argues the error was harmless in this case.  Because the error in failing to follow procedures for the appointment of a guardian ad litem was harmless, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Minors J.G. and A.M. were detained, along with their three older siblings, on November 22, 2019.[2]  Section 300 petitions were filed on behalf of the minors based on mother's and A.M.'s father's extensive mutually combative history of domestic violence and untreated substance abuse issues.  A criminal protective order, restraining mother and protecting A.M.'s father, was issued in September 2019; a criminal protective order, restraining A.M.'s father and protecting mother, was issued in October 2019.  Both mother and A.M.'s father had admitted they used methamphetamine and both minors' hair tests were positive for methamphetamine.  The section 300 petitions also alleged mother had untreated mental health issues for which she self-medicated with methamphetamine, that mother had recently been life-flighted to the emergency room with a stab wound that she claimed had been inflicted by A.M.'s father but police believed was self-inflicted, that mother neglected the minors and had engaged in a physical altercation with one of the older siblings, and that mother neglected her own

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     The three older siblings were placed in permanent plans of nonminor dependency status and guardianship and are not subject to this appeal.

2

medical conditions and failed to obtain necessary dental care for her children, several of whom were suffering from chronic mouth pain as a result.

Mother was diagnosed with tumors in her head and throat in 2018. She had a stroke in 2018, and hospital staff informed the Department that mother had a growing tumor in her head and cancer in her liver. The Department provided mother services, but mother had not been cooperative. On November 5, 2019, mother reported she had stopped going to her medical appointments because the tumors had returned. Mother permitted known drug dealers around her children and failed to comply with the arranged safety plan to protect the minors from domestic violence.

Both mother's counsel and A.M.'s father's counsel were unprepared to proceed at the January 6, 2020, jurisdiction hearing due to lack of contact with their clients. The matter was set for a contested jurisdiction hearing on February 3, 2020. Mother and A.M.'s father were ordered to make and keep appointments with their counsel.

At the February 3, 2020, contested jurisdiction hearing, mother's counsel advised the court he had met with mother and that "[t]here was a [Penal Code] section 1368 doubt voiced on my client's other [(criminal)] case in Department II, and a physician was appointed." He asked the court to appoint a guardian ad litem "at least until the capacity issue is resolved." The court appointed Angeles Carrion as guardian ad litem for mother, noting, "if we have a parent who may be mentally incompetent in a dependency proceeding, that person must have a guardian ad litem appointed." The court further cited the test used to determine the need for the appointment of a guardian ad litem— "whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case." The court advised mother that the appointment of the guardian ad litem meant that she was to cooperate and speak with her attorney and her guardian ad litem and asked mother if she had any objection to the court appointing Carrion, to which mother responded, "no." The contested jurisdiction hearing was continued to March 2, 2020.

At the March 2, 2020, contested jurisdiction hearing, the court recounted that it had appointed a guardian ad litem for mother and added: "Mr. Smith [(mother's counsel)], the reason I made that appointment is because you indicated that you have had difficulty and that you believe that she does lack the ability to help you prepare her case; is that correct?" Mother's counsel responded, "That is correct." Mother's counsel added: "But it would seem that the doctor tasked with the [Penal Code section] 1368 evaluation believes that she is trial competent, although the Court has yet to rule on that matter." Mother's counsel then clarified that mother had been found trial competent "[i]n the criminal context." When asked for her input, the guardian ad litem stated: "I would agree that we could proceed under these proceedings with my assistance to [mother] to explain what's going on. And I would be able to then help Mr. Smith in that regard, be able to make decisions for [mother] in the best interest." The court found that proceeding with the guardian ad litem remained appropriate.

The juvenile court then proceeded with the jurisdiction hearing. The court asked mother's counsel and guardian ad litem if mother was "submitting on the report" as to the issue of jurisdiction, and mother's counsel responded: "No, [y]our Honor. With respect, we are not submitting it on the report. My client has instructed me—and just a few minutes ago—that she disagrees with all of the allegations of the petition, and she denies each and every material fact in the jurisdictional hearing report. If I could, [y]our Honor, my only next question, with Ms. Carrion's assistance, is going to be to ask her if she wishes to testify in this proceeding. A question she has yet to answer, even though I have asked it." The court noted that the hearing was a contested jurisdiction hearing so it was the time to present evidence and for mother to testify, if she was going to do so.

After an off-the-record discussion, the court noted that A.M.'s father indicated he was prepared to submit and explained: "[W]hat that means is that as far as you're concerned, you can figure out what's happened here based on the report that I referred to already, and that you don't intend to submit any evidence. You are entitled to submit

4

evidence you are entitled to bring [witnesses] in on behalf of the people who could testify. They would have to swear to tell the truth, and they would tell me whatever it is that's relevant about this situation. You, yourself, have the right to testify also if you wish, but when you say you submit, that means to me that you're not going to testify nor are you having any other witnesses here today." A.M.'s father stated he agreed.

The court then asked mother's counsel whether he was asking the court to listen to evidence, mother's counsel responded: "No, [y]our Honor. We're prepared to submit the matter on the department's jurisdictional report, and the guardian ad litem concurs." The court then addressed mother personally, asking her if she understood "what's happening today" and mother responded: "She already explained to me. Yes." The court had mother confirm a second time that the guardian ad litem had explained it to her. The following colloquy then occurred:

"THE COURT: Thank you. And you understand that if you wanted to tell me more, you could be sworn in and we could ask you some questions about it if you want? Do you understand?

"[MOTHER]: Yes.

"THE COURT: So, as of right now, nobody is going to get sworn in and no one is going to talk to me.

"Do you understand that?

"[MOTHER]: Yes.

"THE COURT: Did you want to talk to me under oath? Meaning do you want to swear to tell the truth and talk to me?

"[MOTHER]: No.

"THE COURT: Okay. I find that she understands her rights and that she is giving them up and that she's submitting on the report.

"Her guardian ad litem agrees with that.

"MS. CARRION: Yes, [y]our Honor.

5

"THE COURT: And her attorney?

"MR. SMITH: Yes, [y]our Honor."

The juvenile court then found the allegations in the section 300 petitions true. Thereafter, the Department informed the court that there were problems with mother's supervised visits. Mother had been accepting money from her children; she berated the children during visitation; she questioned the children about statements attributed to them in the social worker's report; she told the children on two occasions that she was recruiting women to be prostitutes; she told the children that she only had a short time to live; and she complained that the children were required to cook and clean at the foster home. Mother was admonished not to talk to the children about the case or discuss whether she is dying from her medical conditions or her visitation would be terminated. The disposition hearing was set for April 6, 2020.

On April 6, 2020, mother spoke with her attorney outside the courthouse and then counsel "excused her" from the remainder of the proceedings. Several parties, including mother's guardian ad litem, appeared via "Zoom," as the court did not want everyone present in the courtroom due to the coronavirus disease 2019 (COVID-19) pandemic. The social worker's disposition report had recommended reunification services be provided to mother as to all of her children, and to A.M.'s father as to A.M. The report did, however, disclose that the social worker had been unable to obtain a biosocial assessment of mother because of her "inability to maintain a conversation," and that mother's "labile mood and constantly being on the defense has been counterproductive for case management, assessments and services." The social worker reported she was having difficulty having a productive conversation with mother because mother's "emotional stability has been very erratic. She is very labile, jumping from anger, to guilt, to sadness and crying. She is tangential, and unable to focus on one topic." The social worker also reported that mother had missed many visits without legitimate reasons and missed others for testing positive on her drug tests or not testing at all, that

6

mother berated, interrogated, and argued with her children during visits, and that mother and A.M.'s father had been seen together on several occasions by various law enforcement officers despite the mutual criminal protective stay-away orders. Mother's recommended reunification services included a drug and alcohol intake, attendance and completion of a parenting class, and participation in a domestic violence course, mental health services, substance abuse services, her own medical care, and substance abuse testing. Mother's counsel and guardian ad litem submitted on the social worker's disposition report and the court adopted the recommendations therein.

Prior to the six-month review hearing, the Department filed section 388 petitions, requesting reunification services be terminated due to mother's failure to begin to participate in services until four months into the six-month reunification period. The petition alleged mother had not participated in parenting classes or mental health services, and she did not make any effort in her domestic violence course. Her visits with the children were reported to be inconsistent for several months, she had no relationship with the children, who would sometimes refuse to visit, and mother refused to work on that issue, as well. A.M.'s father had been sentenced to four years in state prison. Mother's failure to substantially participate or make progress in her reunification services was detailed in the social worker's six-month review report.

The six-month review hearing, which was consolidated with the hearing on the section 388 petition, took place on October 5, 2020. Mother appeared with her counsel and guardian ad litem. The court first proceeded with the hearings as to minor A.M. After A.M.'s father's counsel submitted on the social worker's report, mother's counsel informed the court that he had communicated with mother and her guardian ad litem and they had no additional evidence to offer but would like to "be heard with regard to the disposition . . . ." The juvenile court then clarified for the parents that submitting on the reports meant, although they may not agree with the report, no one was going to be sworn in to testify and they were agreeing that the court would make its decision based on what

7

is written in the reports and counsel's comments. Mother's counsel noted that how to proceed was really a matter of trial tactics but that he had consulted with mother and the guardian ad litem and they agreed to submit on the reports without submitting additional evidence. The juvenile court expressly asked the guardian ad litem if she agreed, and she affirmed that she did. The juvenile court then expressly asked mother if she, personally, understood what it said about submitting on the report and mother confirmed that she understood and agreed to doing so.

Mother's counsel noted that mother did not disagree with any of the facts in the six-month review report, and relayed mother's position to the court, as follows: "What she has asked me to do is request the Court to consider continuing services, and she wants the Court to understand that she wants what's best for this child [A.M.]" The juvenile court asked mother's counsel for his assessment as to whether mother continued to need her guardian ad litem. Counsel responded that "if the Court doesn't object, it's been very helpful so far." The court continued Carrion as mother's guardian ad litem.

Regarding J.G., mother's counsel expressed gratitude to mother for her hard work in keeping communication open with his office and to the guardian ad litem for coordinating the communication. Mother's counsel stated they were submitting on the report "without agreement to the recommendation and without the offer of additional services." The court again confirmed with mother that she understood what it meant to submit on the report and obtained her personal confirmation that she agreed to submit on the report. The court also confirmed with mother's guardian ad litem that she had "gone over this" with mother. The juvenile court then terminated family reunification services and set a section 366.26 hearing for February 1, 2021.

The social worker's section 366.26 report recommended (1) the minors' three older siblings be placed in permanent plans of nonminor dependency status and guardianship and (2) termination of parental rights with adoption as the permanent plan for minors J.G. and A.M. J.G. and A.M. had been in the same foster home since

8

detention, were very attached to the foster parents, and the foster parents were prepared to provide permanency through adoption. Mother did not object to the recommendations for permanency for the minors' three older siblings but, at the hearing, her counsel explained that she did object to the termination of her parental rights for J.G. and A.M. and would "like to be heard with a brief amount of testimony either today or any other time the Court chooses." Mother's guardian ad litem gave permission for mother to be sworn in to testify. Mother testified that she understood the recommendation of the Department that her parental rights as to J.G. and A.M. be terminated and claimed she had completed all of her services. She testified that she was prepared to assume custody of the minors but, if the court would not return them to her, she would like them to be given to her father. Mother's guardian ad litem then advised the court she and mother's counsel had "explained things" to mother and mother's big issue is losing the contact or the availability of contact with her children.

The juvenile court found minors J.G. and A.M. likely to be adopted and terminated parental rights.

DISCUSSION

Mother contends the juvenile court violated her due process rights by appointing a guardian ad litem without following the statutory procedures and in the absence of substantial evidence of her lack of capacity to understand the nature and consequences of the proceedings or meaningfully assist her counsel. We conclude that, while appropriate procedures were not followed prior to the appointment of mother's guardian ad litem, the error did not result in prejudice to mother in this case and was, therefore, harmless.

When the juvenile dependency court has knowledge of a party's minor status or incompetence, it has an obligation to appoint a guardian ad litem. (*In re A.C.* (2008) 166 Cal.App.4th 146, 155.) In a juvenile dependency case, the test of mental incompetence "is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.]"

9

(*In re James F.* (2008) 42 Cal.4th 901, 910.) "The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing. [Citations.]" (*Ibid.*) Accordingly, a parent is entitled to due process prior to the appointment of a guardian ad litem. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 669.)

It is unclear from the record whether mother's counsel initially believed she needed a guardian ad litem based on mother's inability to understand the nature or consequences of the proceedings or to assist counsel in protecting her interests in the companionship, custody, control, and maintenance of the minors, or whether the initial concern was based solely on the concern that had been raised in mother's criminal case. But counsel did later clarify that he believed the guardian ad litem was necessary to assist mother in understanding the proceedings and to facilitate otherwise difficult communication with mother.

When a parent's attorney concludes that a guardian ad litem should be appointed, the attorney must either (a) approach the client and request consent to the appointment, or (b) not consult with the client and approach the court directly. If the attorney consults with the client and receives consent for the appointment of a guardian ad litem, the due process rights of the parent will be protected, since the parent participated in the decision to request the appointment. (*In re Sara D., supra*, 87 Cal.App.4th at p. 668.) Here, while the juvenile court, when it appointed the guardian ad litem, asked mother if she consented to the appointment, neither the court nor counsel first explained to mother what the appointment means in general and what it would mean to her. (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1189.) On this record, it cannot be said that mother's consent satisfied due process requirements. (See *In re Joann E.* (2002) 104 Cal.App.4th 347, 355-356 [parent must be informed of the significance of the appointment to establish knowing consent to appointment of guardian ad litem].)

The juvenile court or counsel should have explained to mother the purpose of a guardian ad litem and why her attorney felt one should be appointed. Mother should have then been given an opportunity to respond. (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 672.) This was not done.

"[E]rror in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding[, however,] is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice." (*In re James F., supra,* 42 Cal.4th at p. 915.) Under the harmless error standard, "[w]e do not set aside the judgment unless a different result would have been probable had the error not occurred. [Citation.]" (*In re A.C.*, *supra*, 166 Cal.App.4th at p. 157.)

Mother argues the error was not harmless because the court did not make the necessary findings and the record establishes that she was, in fact, able to understand the nature and consequences of the proceedings and to assist her counsel in preparing the case.

We agree that the record reflects the juvenile court found, after mother had consulted with both her counsel *and* her guardian ad litem, that she understood the nature of the proceedings and had voluntarily agreed to submit the jurisdictional issues on the social worker's report without exercising her right to testify, but while also reserving her position that she contested the material facts contained therein. We also agree that the record reflects the juvenile court found, again after mother had consulted with both her counsel *and* her guardian ad litem, that she understood the nature of the proceedings and had voluntarily agreed to submit the issues at the six-month review hearing on the social worker's report without exercising her right to testify. But we need not consider whether mother would have understood those matters in the absence of her guardian ad litem's assistance. Nor must we address the conflicting evidence of mother's ability, without the assistance of her guardian ad litem, to not only understand the proceedings, but assist her

11

counsel in preparing the case.[3]  We do not determine whether the error was harmless by considering whether the juvenile court would have, nonetheless, found appointment of a guardian ad litem necessary had it followed the proper procedure.  Instead, we determine whether the error was harmless by considering whether the appointment of a guardian ad litem for mother in this case affected the outcome of the termination hearing.  (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93.)  As we explain, we conclude it did not affect the outcome in this case.

Mother claims she was prejudiced by the improper appointment of the guardian ad litem because it "took critical decisions out of [her] hands."  Her claim is not supported by the record.  Mother argues she was prejudiced by her guardian ad litem's and counsel's submission on the social worker's report at the contested jurisdiction hearing when she disagreed with " 'every material fact.' "[4]  Not so.  First, we reject the suggestion that mother's counsel and guardian ad litem conceded any facts with which mother took issue.  Mother's counsel specifically voiced mother's disagreement "with all

---

**3**   For example, mother's counsel requested the court continue the section 366.26 hearing because "my client has come in to see me and independently of that has come in to see the guardian ad litem that the court appointed on this case.  She's been completely cooperative, but there have been communication issues abounding and frankly I would like this case continued so that I could have another session with my client.  [¶]  We are anticipating testimony and while we could proceed today, I do not feel prepared for that testimony and even at the outside I am expecting it to be less than 20 minutes but I don't feel prepared to proceed today.  I would like very much for the guardian ad litem to be present during my client's testimony, if that's at all possible.  She's been very able in her ability to assist me with communication in the past."  This statement does not comport with mother's contention on appeal that the record does not support that she lacked the capacity to understand the nature or consequences of the proceeding and to assist her counsel in preparing the case.

**4**   For purposes of our discussion, we will assume, without deciding, that mother may make her showing of alleged prejudice caused by the appointed guardian ad litem based on the actions or inactions of the guardian ad litem at hearings from which she did not appeal and the resulting orders are now final.

12

of the allegations of the petition," and informed the court that mother "denies each and every material fact" in the jurisdictional hearing report. Second, it was only after mother was asked if she wished to testify and she declined that her counsel, with her guardian ad litem's consent, submitted on the report. In any event, as the juvenile court made abundantly clear in the proceedings below, submission on the report did not concede the facts contained in the petition or social worker's report. Moreover, the guardian ad litem and counsel did not submit on the report in the absence of mother's consent. Mother expressly and personally agreed to submit on the social worker's jurisdiction report. Thus, mother was not prejudiced in any way by having a guardian ad litem at the jurisdiction hearing.

With respect to the disposition hearing, the Department's recommendation, which the juvenile court adopted, provided mother with a multitude of reunification services. Mother does not now suggest how she could have fared better. There is no indication mother was prejudiced in any way by having a guardian ad litem at the disposition hearing.

At the combined section 388/six-month review hearing, the juvenile court again carefully explained to mother what it meant to submit without agreeing to the recommendation or offering of additional evidence and confirmed with mother's personal and express statement that she understood and agreed to proceed by way of argument only, without presenting additional evidence. Mother's counsel also expressly stated they were submitting on the report *without* agreement to the recommendation. Mother does not identify any way she was prejudiced at this hearing by having a guardian ad litem.

Finally, mother does not identify any prejudice resulting from the continued appointment of her guardian ad litem at the section 366.26 hearing. Mother's guardian ad litem did not withhold consent for mother to testify at the hearing or otherwise waive any rights or concede any facts. Indeed, despite the appointment of a guardian ad litem in this case, who apparently assisted in explaining the proceedings to mother and facilitating

13

communication between mother and counsel, the guardian ad litem did not act to control the litigation in mother's stead or waive any of mother's rights. The juvenile court consistently obtained mother's personal consent to proceed in the manner in which her counsel determined was appropriate, despite the fact that mother had been appointed a guardian ad litem. There is simply no suggestion in the record that mother was prejudiced in any way at any hearing by the appointment of a guardian ad litem. Accordingly, mother's contention that she was prejudiced because the appointment of the guardian ad litem "took critical decisions out of [her] hands" fails.

Mother also asserts that prejudice resulting from the appointment of the guardian ad litem "can be inferred as incompetence is incompatible with good parental judgement [*sic*]." She argues that "the court's view that [mother] lacked the basic competence to understand the proceedings or to help her attorney directly impacts the court's perception regarding [her] ability to be an adequate parent to her children." She further argues that "[b]y determining that [mother] lacked competence in the dependency proceeding, the court, in effect, determined that [mother] lacked competence to be a parent and to be able to benefit from reunification services." There is no presumption or assumption, in law or logic, that supports mother's assertion that a finding that a parent requires a guardian ad litem renders that parent unable to be a parent or to benefit from services. Appointment of a guardian ad litem may be necessary for many reasons not implicating a parent's ability to effectively parent a child or utilize services. "[P]arent(s) whose custody of the child is being challenged often have various problems—physical, mental or emotional—which may make it difficult to understand the legal process to which they are exposed and may make it difficult for them to provide assistance to their appointed attorney. The attorney may find it difficult to communicate with the client. Accordingly, the attorney may determine that in order to protect the client's rights, a guardian ad litem should be appointed." (*In re Sara D., supra*, 87 Cal.App.4th at p. 667.) The finding that a parent requires a guardian ad litem does *not* amount to a finding that a

14

parent is unable to parent or benefit from services. If such were the case, reunification services would be automatically denied in every case in which a guardian ad litem is appointed. Indeed, mother was *not* bypassed for services in this case.[5]

Mother cites to certain comments made at the disposition hearing, that the recommendation that reunification services be provided was a generous one, as proof of the "detrimental impact" of the court's decision to appoint a guardian ad litem for mother. We are unpersuaded.

Prior to these comments, the court had been informed by the social worker's report that mother had been missing many visits without legitimate reasons and others for testing positive on her drug tests or not testing at all, and was further informed of mother's problematic behavior at visitation. She was reported to berate, interrogate, and argue with the minors at visits she attended. Her visits were unproductive and her conversations inappropriate. She also dressed inappropriately, in very revealing attire, and displayed bruises on her arms and hickeys on her neck and chest. A.M.'s father had also been missing visits and was not following directions at the conclusion of the visits he attended. In addition to both mother and A.M.'s father continuing to use drugs, they both continued to be "constantly together" despite mutual stay-away orders, and they were avoiding focusing on the issues that brought the minors under the jurisdiction of the court.

_____

[5]  While section 361.5, subdivision (b)(2) does provide for bypassing a parent for reunification services if that parent is suffering from a mental disability that is described in Family Code section 7820 et seq. that renders him or her incapable of utilizing those services, the court must first receive competent evidence from mental health professionals establishing that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within the proscribed time limits. (§ 361.5, subds. (b)(2) & (c)(1).) The Department did not recommend application of this section nor present expert evidence to support it.

At the disposition hearing, referring to the recommendation that reunification services be provided to mother and A.M.'s father, the juvenile court noted that it had "read these reports, and I have to say I think it's a generous recommendation by the department. Neither [A.M.'s father] nor [mother] have really taken this seriously." The court then addressed A.M.'s father, urging him to talk to his attorney soon and warning him if he did not change his situation and prioritize A.M. in his decisionmaking, he would lose custody of A.M. permanently. The court then reiterated that "it was a very generous offer given the circumstances with these children" and indicated it would follow the recommendation that reunification services be provided. County counsel thereafter remarked that the Department did not really have a choice but to recommend services, as none of the provisions for bypassing mother for services, such as the provision in section 361.5, subdivision (b)(2) had been established. The court responded that when it said it was a generous recommendation, it knew the Department did not really have a choice, and noted that "[s]ometimes the law is generous when I might personally agree it might not need to be."

Taken in context, the juvenile court's remarks do not suggest that it did not believe mother's inability to understand the nature of the proceedings or assist her counsel also rendered her unable to be a parent or benefit from services. The remarks instead reflect the juvenile court's displeasure at A.M.'s father's and mother's failure to take the dependency proceedings seriously.

In sum, we conclude that, while the juvenile court did not follow proper procedures prior to appointing a guardian ad litem for mother, the error did not result in any prejudice to mother in this case.

# DISPOSITION

The orders of the juvenile court (terminating parental rights) are affirmed.

/s/                 
HOCH, J.

We concur:

/s/           
RAYE, P. J.

/s/           
ROBIE, J.